UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
v. )  No.:  3:24-CR-5-TAV-DCP
)
BRADLEY JOHN KELLER, )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

This criminal matter is before the Court for consideration of the Report and Recommendation entered by United States Magistrate Judge Debra C. Poplin on October 3, 2025 [Doc. 87], recommending that defendant's motion to suppress [Docs. 62, 64] be denied. Defendant objected to the R&R [Doc. 89] and the government responded [Doc. 90]. Thus, the matter is now ripe for review. *See* E.D. Tenn. L.R. 7.1(a).

For the reasons below, defendant's objections to the R&R [Doc. 89] are **OVERRULED**. The Court **ACCEPTS** and **ADOPTS** the R&R [Doc. 87] in whole, and **DENIES** defendant's motion to suppress [Docs. 62, 64].

## I.    Background

In the R&R, Judge Poplin succinctly summarized the facts of this case:

Defendant is charged with being a felon in possession of a firearm [Doc. 10 p. 1]. This charge arises out of events in the early morning of October 29, 2023, when officers from the Monroe County Sheriff's Office ("MCSO") went to Defendant's residence after receiving a 911 call from a male, who made a noise complaint about a party and upon learning that law enforcement would not intervene, told the dispatch he would handle it himself and stated the dispatcher should send an ambulance because someone was about to die. Officers linked the caller's telephone number to Defendant's wife, learned of

a report to another law enforcement agency that Defendant would be calling to shut down the party, and identified Defendant's address and involvement in prior incidents involving aggressive behavior and firearms in their internal reporting system. Approximately two and one-half hours after the call, officers surrounded Defendant's residence and ordered him to come out. Defendant exited the residence and fired multiple shots at the officers, who returned fire. Defendant then retreated back into the residence, came out again without his firearm, and the officers took him into custody.

[Doc. 87, pp. 1–2].

Judge Poplin then made the following findings of fact, which, with the exception of the underlined portions, are unopposed, and therefore, the Court will adopt them:

Around 11:00 p.m. on October 28, 2023, the Monroe County dispatcher received a noise complaint for a residence at 2010 Green Road in Madisonville, Tennessee. The male caller, who called from 423-519-6128, identified himself as Kenneth Raper and stated that loud music and a child's screams were coming from the residence. MCSO Sergeant John Newman and Deputy Sasha Rinehart were dispatched to the Green Road residence. At the residence, they found a Halloween party with a bonfire and adults drinking outside. Inside the residence were adults supervising children making cookies. The officers did not observe anything illegal occurring. Sergeant Newman asked the homeowner Mr. Alexander if he knew Kenneth Raper. Mr. Alexander stated that Kenneth Raper was his deceased grandfather who had bequeathed the residence to him. Finding nothing illegal, the officers left the Green Road residence.

At 12:03 a.m. on October 29, 2023, the dispatcher received a second call from 423-51[9]-6128, and the male caller again identified himself as Kenneth Raper and complained of noise at the Green Road residence. When the dispatcher explained that the county did not have a noise ordinance, the complainant stated, "Right, well, can you go ahead and tell them we tried it the legal way, and I'm strapping on my boots right now; you can go ahead and send an ambulance because somebody's fixing to die." Sergeant Newman and Deputy Rinehart returned to the Green Road residence, where they saw no evidence of the complainant.

After checking on the Green Road residence, Sergeant Newman and Deputy Rinehart began investigating the second 911 call. Deputy Rinehart requested the recording from the dispatcher. After she and Sergeant Newman listened to the recording of the call, Sergeant Newman asked Deputy Crawford to

2

identify the caller by performing a reverse telephone number search of 423-519-6128. Deputy Crawford performed the check and informed Sergeant Newman that the telephone number came back to Taunya Keller. The officers checked Taunya Keller's name and the 423-519-6128 telephone number in their Report Management System and learned her name and that telephone number were linked to 541 Meadow View Lane in Madisonville. Sergeant Newman also learned from MPD officers that their Assistant Chief of Police stated that Bradley Keller, Taunya Keller's husband, would likely call the police that day to try to shut down a party on Green Road because his grandchildren were at the residence, and he did not want them there. A search of Bradley Keller's name in the RMS database revealed that he had several felony convictions and had been aggressive with law enforcement and possessed firearms in the past.

Sergeant Newman then contacted the on-call DA and explained the 911 call and what his investigation thus far revealed. The DA advised Sergeant Newman that he had probable cause to arrest Defendant for making terroristic threats in violation of new legislation in Senate Bill 69. The DA advised Sergeant Newman that Defendant should be arrested to prevent the threat stated in the 911 call from happening. Sergeant Newman also called MCSO Lieutenant Jason Fillyaw to request the assistance of the SWAT unit. Lieutenant Fillyaw told Sergeant Newman to go to Defendant's address, to try to "make contact" with Defendant, and if Sergeant Newman needed more resources, to call him back.

Sergeant Newman, Deputy Rinehart, and three other MCSO deputies and two MPD officers gathered at the Monroe County Rescue Squad building to create a plan for contacting Defendant at his residence safely, given Defendant's prior aggressive conduct toward law enforcement. Sergeant Newman determined that four officers with ballistic shield and a shotgun loaded with bean-bag rounds would be stationed on one side of the front of the residence and that two officers would be stationed on the opposite side. He said that he would attempt to get Defendant to exit the residence peacefully by calling the telephone number used for the 911 call or using his PA system. The other officers would then detain Defendant, allowing Sergeant Newman to either confirm that Defendant made the threat and arrest him or dispel the concern that Defendant would act on the threat and let him go.

Around 2:30 a.m., the officers arrived at Defendant's residence, parked their patrol cars around 200 feet away from the residence, and positioned themselves as previously planned. The officers entered onto Defendant's property and stood in the grass approximately six feet away from the corners

3

of the house. Sergeant Newman, who was located on the street across from the residence, called the number used in the 911 call twice but no one answered. Deputy Clayton then moved Sergeant Newman's patrol car to the edge of Defendant's driveway but without blocking the driveway. Sergeant Newman made three announcements using the PA system in his patrol car, identifying himself as an MCSO officer, stating the announcement was of the residents of 541 Meadow View Road, and directing Defendant to come out of the house with his hands empty. The announcements were approximately one minute apart. The officers received no response from the residence, and no one exited. Sergeant Newman then directed one group of officers to knock on the window of the residence. After the officer knocked and reported hearing movement within the house, Sergeant Newman again announced on his PA system that he was with the MCSO and directed Defendant to come out of the residence with his hands empty.

About thirty seconds after this last announcement, Defendant exited the front door of his residence, pointed a shotgun at the officers, and fired multiple rounds. The officer with the shotgun fell to the ground, and Deputy Crawford returned fire. Defendant then retreated into the house. Shortly thereafter, Defendant exited his residence from a side door and backed down the steps and toward the officers with his hands raised. Officers took Defendant into custody.

[Doc. 87, pp. 23–26 (emphasis added)].

In analyzing defendant's Fourth Amendment challenge, Judge Poplin concluded that, based on the circumstances, including that officers took up strategic positions around the yard, one group of officers had a ballistic shield and a shotgun loaded with bean-bag shot, and officers did not knock on the door, but rather, waited outside while repeatedly ordering defendant to exit over a PA system in a patrol car, the officer's entry onto defendant's property had none of the hallmarks of a consensual encounter, nor was it a permissible knock and talk [Doc. 87, pp. 28–29].

Judge Poplin disagreed with defendant's assertion that officers lacked probable cause to believe that defendant was the 911 caller or that he had committed any crime [*Id.*

4

at 29]. Specifically, she stated that "[a]t the time the officers entered Defendant's property, they knew that a reverse telephone number search linked the telephone number used by the 911 caller to Defendant's wife; that searching that telephone number in their RMS system identified the 541 Meadow View Road address, which is the address of Defendant and his wife; and that the Assistant Chief of Police stated that Defendant would likely call to stop a party at 2010 Green Road because he did not like his grandchild being at the party. This information linked the two 911 calls from 'Kenneth Raper' to Defendant" [*Id*. at 29]. In a footnote, Judge Poplin addressed defendant's argument that the subscriber information shows the reverse telephone number check was false, concluding that the results of the reverse telephone number search were corroborated by the RMS search linking that telephone number to Defendant's address [*Id*. at 29 n.9]. Ultimately, Judge Poplin concluded that officers had probable cause to believe defendant had made a false report to law enforcement in violation of Tennessee Code Annotated § 39-16-502(a)(2) [*Id*. at 30].

However, Judge Poplin noted that probable cause alone was not sufficient, but rather, a warrant with a judicial finding of probable cause was required [*Id*.]. Thus, she turned to whether an exception to the warrant requirement applied in this case [*Id*.]. Judge Poplin concluded that the government had failed to carry its burden of demonstrating that the exigent circumstances exception applied [*Id*. at 32].

Nonetheless, Judge Poplin noted that, to be seized for purposes of the Fourth Amendment, a person's liberty must be restrained by physical force of show of authority [*Id*. at 33]. Judge Poplin concluded that the totality of the circumstances indicate that officers were attempting to seize defendant, but that defendant did not submit to the show

5

of authority outside his residence, instead, ignoring law enforcement's directions and then shooting at the officers, which is the "antithesis of submission to the officers' authority and constitutes a crime" [*Id*. at 34]. Judge Poplin concluded that defendant's act of shooting at the officers was a new, distinct crime, committed in the officers' presence, noting that an arrest for a new distinct crime is permissible even if the new crime is in response to police misconduct and causally connected thereto [*Id*. at 34–35 (citing *United States v. Thomas*, No. 14-20319, 2016 WL 11477623, at *9 (W.D. Tenn. May 12, 2026))]. Thus, Judge Poplin determined that the officers could lawfully arrest defendant for the new, distinct crime, despite their Fourth Amendment violation in entering his property [*Id*. at 35].

## II.     Standard of Review

The Court reviews *de novo* those portions of the R&R to which a party has objected. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b). Accordingly, the Court considers defendant's motion, the government's response, the R&R, the objections, and the response thereto, all in light of the applicable law.

Objections to any part of a magistrate judge's disposition "must be clear enough to enable the district court to discern those issues that are dispositive and contentious." *See Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995); *see also Thomas v. Arn*, 474 U.S. 140, 147 (1985) (stating that the purpose of the rule is to "focus attention on those issues . . . that are at the heart of the parties' dispute"). Each objection to a magistrate judge's recommendation should describe how the analysis is wrong, why it was wrong, and how *de novo* review warrants a different result on a particular issue. *See Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). A general objection that

6

merely restates an argument previously presented or simply voices a disagreement with a magistrate judge's suggested resolution "has the same effect[] as would a failure to object." *Austin v. Comm'r of Soc. Sec.*, No. 1:19-cv-2380, 2021 WL 1540389, at *4 (N.D. Ohio, Apr. 19, 2021) (citation omitted); *see also United States v. Dawson*, No. 4:19-cr-206, 2020 WL 109137, at *1 (N.D. Ohio, Jan. 9, 2020) (citations omitted) ("[T]he Court is under no obligation to review *de novo* objections that are merely an attempt to have the district court reexamine the same arguments set forth in the petition and briefs.").

## III. Analysis

### A. Probable Cause[1]

Defendant objects to the R&R's conclusion that "[c]onsidering the totality of the circumstances known to the officers, the officers had probable cause to believe Defendant had made a false report to law enforcement in violation of Tennessee Code Annotated § 39-16-502(a)(1), which is a Class D felony" [Doc. 89, p. 5 (quoting Doc. 87, p. 30 (footnote omitted))]. Defendant argues that there was no probable cause to believe he had made a false report to law enforcement in violation of § 39-16-502(a)(2) [*Id.*]. Specifically, defendant contends that there is no probable cause to believe that he was the person making the "threatening phone calls," and, whoever did make the phone calls did not violate subsections A, B, or C of § 39-16-502(a)(1) [*Id.* at 6].

---

[1] The Court has reorganized defendant's objections in this memorandum opinion and order, because many of defendant's factual objections stem from a misunderstanding of the R&R's legal analysis. As a result, the Court will first address the relevance of the R&R's probable cause determination and then address the related factual findings.

7

The government responds that, even though law enforcement did not assert that there was probable cause for making a false report, the magistrate judge correctly concluded that probable cause existed for that crime [Doc. 90, p. 6].

The Sixth Circuit has indicated that objections must "be specific in order to focus the busy district court's attention on only those issues that were *dispositive and contentious*." *Howard*, 932 F.2d at 509 (emphasis added); *see also Miller*, 50 F.3d at 380 (stating that "objections must be clear enough to enable the district court to discern those issues that are *dispositive and contentious*" (emphasis added)). To be dispositive, a matter must be "a deciding factor" or "a fact or factor [] bringing about a final determination." *Dispositive*, BLACK'S LAW DICTIONARY (12th ed. 2024).

While the magistrate judge did determine that probable cause existed under Tennessee Code Annotated § 39-16-502(a)(2), that determination was not *dispositive* of defendant's motion to suppress. In fact, Judge Poplin's ultimate legal conclusion was that, even if probable cause existed, law enforcement needed a warrant for their actions in entering defendant's property in an effort to arrest him, but defendant's eventual arrest was legal based on his intervening action of shooting at officers [*See* Doc. 87]. Accordingly, whether or not probable cause existed under § 39-16-502(a)(2) is irrelevant to the ultimate legal conclusion, and, therefore, the disposition of defendant's suppression motion. That is to say, Judge Poplin concluded that, *regardless* of the existence of probable cause, a warrant was needed, and police did not obtain a warrant [*See id.*]. As a result, the conclusion that probable cause existed under § 39-16-502(a)(2) is not dispositive, and the Court need not rule on this objection.

8

**B.    Identification of Caller**

Next, defendant objects to the finding of fact in the R&R that "[a]t 12:03 a.m. on October 29, 2023, the dispatcher received a second call from 423-51[9]-6128, and the male caller again identified himself as Kenneth Raper . . ." [Doc. 89, p. 1 (quoting Doc. 87, p. 23)]. Defendant states that the caller does not identify himself at any point in the second 911 call [*Id.*].

The government responds that the male individual who used the phone number 423-519-6128 to call into dispatch the first time identified himself as "Kenneth Raper" [Doc. 90]. The second time the same phone number called dispatch, the caller did not state his name during the recorded call but stated "I called in a while ago about a disturbance up there at 2010 Green Road" [*Id.* at 1–2]. In addition, 911 dispatch knew it was the same caller based on the Monroe County 911 log that the defendant provided in his supplemental brief which states that the "caller name" is "Kenneth Raper" and the note dated "10/29/23 00:03:28" states "comp has called back and made threats . . ." [*Id.* at 2].

Once again, there is nothing dispositive about Judge Poplin's factual finding regarding the identity of the caller in the second 911 call to come from phone number 423-519-6128. At best, this factual finding could be deemed relevant to the determination of probable cause. But, as discussed *supra*, Judge Poplin's conclusion that probable cause existed is not dispositive of the motion to suppress. Instead, Judge Poplin concluded that law enforcement needed a warrant to enter defendant's property and did not have one, in violation of the Fourth Amendment, but that defendant's eventual arrest was legal based on his intervening actions [*See* Doc. 87]. Nothing about the identity of the caller in the

9

second 911 call would alter this analysis, and therefore, the Court need not address this objection.

**C.    Reverse Telephone Number Search and Report Management System Search**

Defendant devotes several of his objections to factual findings and conclusions regarding the alleged reverse telephone number search conducted by police before approaching his home to make contact and/or arrest him.  Specifically, defendant objects to the R&R's factual findings that:

> Sergeant Newman asked Deputy Crawford to identify the caller by performing a reverse telephone number search of 423-519-6128.  Deputy Crawford performed the check and informed Sergeant Newman that the telephone number came back to Taunya Keller.  The officers checked Taunya Keller's name and the 423-519-6218 telephone number in their Report Management System and learned her name and that telephone number were linked to 541 Meadow View Lane in Madisonville

[Doc. 89, p. 2 (quoting Doc. 87, p. 24)].  Likewise, defendant objects to Judge Poplin's conclusion that:

> At the time the officers entered Defendant's property, they knew that a reverse telephone number search linked the telephone number used by the 911 caller to Defendant's wife; that searching that telephone number in their RMS system identified the 541 Meadow View Road address, which is the address of Defendant and his wife; and that the MPD Assistant Chief of Police stated that Defendant would likely call to stop a party at 2010 Green Road because he did not like his grandchild being at the party.  This information linked the two 911 calls from "Kenneth Raper" to Defendant.

[*Id*. at 4 (quoting Doc. 87, p. 29)].  Further, defendant objects to Judge Poplin's footnote stating that:

> Defendant argues that the subscriber information shows the reverse telephone number check to be false [Doc. 85 p. 3].  As argued [sic] the Government [Doc. 82 p. 5 n.7; Doc. 85 pp. 3–4], however, the subscriber

10

information does not reveal who possessed or was using the telephone number, and the results of the reverse telephone number search are corroborated by the RMS search linking that telephone number to Defendant's address.

[*Id.* (quoting Doc. 87, p. 29 n.9)].

Defendant objects that information provided by the government after the suppression hearing proves that the statements about the reverse phone number search cannot be true, and, despite numerous requests before the hearing, defense counsel was never provided a copy of the reverse telephone number search [*Id.* at 2]. Specifically, the information on the subsequent reverse number report does not include the name of defendant's wife or his address, although there are names and addresses on the document [*Id.* at 2, 4]. Defendant also asserts that the allegation that the Report Management System ("RMS") determined that the name and phone number were linked to Meadow View Lane in Madisonville is an impossibility [*Id.* at 2].

The government responds that it is not believed that a reverse lookup "document" ever existed, but rather, most likely, Deputy Crawford viewed the result on a screen and reported the result to Sergeant Newman [Doc. 90, p. 3]. Thus, the government never possessed a document related to the reverse telephone number search [*Id.*]. However, the government has provided, in discovery, cellphone subscriber information associated with the phone number in question [*Id.*]. The government asserts that defendant seems to be confusing the reverse phone number search with the cellphone subscriber records [*Id.*].

In his objection, defendant identifies the reverse telephone number search as the "single most important piece of information in this case" [Doc. 89, p. 5]. At least in the

11

context of this motion to suppress, and the R&R's analysis of that motion, the Court disagrees, and finds that this information is not relevant to the R&R's ultimate legal conclusion and the disposition of defendant's suppression motion. Again, as discussed *supra*, Judge Poplin concluded in the R&R that law enforcement violated defendant's Fourth Amendment rights by entering his property without a warrant, but that defendant's arrest, after shooting at officers, was lawful [*See* Doc. 87]. Defendant's arguments regarding the reverse telephone number search and the RMS search presumptively relate to the lawfulness of law enforcement's entry onto defendant's property in the first instance. But Judge Poplin found in defendant's favor in that regard, concluding that such was a Fourth Amendment violation [Doc. 87, p. 30 ("The undersigned finds the officers' entry onto Defendant's curtilage implicates the Fourth Amendment")]. The reverse telephone number search and RMS search are not relevant to the ultimate inquiry before the Court, which is whether defendant's eventual arrest was permissible based on his action of shooting at officers who had entered the curtilage of his home. Accordingly, because these objections are not dispositive, the Court need not address them.

### D. Attempted Peaceful Contact

Defendant next objects to the following factual finding in the R&R:

[Officer Newman] said that he would attempt to get Defendant to exit the residence peacefully by calling the telephone number used for the 911 call or using his PA system. The other officers would then detain Defendant, allowing Sergeant Newman to either confirm that Defendant made the threat and arrest him or dispel the concern that Defendant would act on the threat and let him go

12

[Doc. 89, p. 2 (quoting Doc. 87, p. 25)]. Defendant contends that Officer Newman testified that he was going to defendant's house to arrest him [Doc. 89, p. 3 (citing Doc. 80, pp. 34–35)]. Additionally, calling the number used by the 911 caller would not have yielded any result as it did not belong to defendant or his wife [*Id.*]. Moreover, Assistant Chief of Police Peak, defendant's neighbor, testified that he did not hear anything from a PA system and, given the close distance between his house and the Keller home, it is unlikely that the Kellers would have heard a PA announcement if he did not [*Id.*].

The government responds that the magistrate judge correctly concluded, based on Sergeant Newman's testimony at the suppression hearing, that Sergeant Newman wanted defendant to exit his home peacefully so that he could detain him and determine whether he made the threatening 911 call [Doc. 90, pp. 4–5].

First, for the same reasons discussed *supra*, the Court finds that this objection is not dispositive. Whether Sergeant Newman intended to arrest defendant or make peaceful contact, whether calling the relevant phone number would have reached defendant, and whether defendant did, or could have, heard the PA announcement from the patrol car, are not relevant facts to the issue before the Court, discussed *infra*, of whether defendant's intervening conduct rendered his arrest legal, which is the dispositive question on this motion to suppress. Accordingly, the Court finds that no ruling is necessary as to this objection.

But regardless, this factual finding is not a finding that it was, in truth, Sergeant Newman's intent to attempt to get defendant to exit the residence peacefully to ascertain whether he made the 911 call. Rather, the factual finding is that Sergeant Newman "said,"

13

while gathered at the Monroe County Rescue Squad building with other officers to create a plan, that he intended to take these actions [Doc. 87, pp. 24–25]. And this finding comes directly from Sergeant Newman's testimony at the suppression hearing that he "created a contact team" and that "the arrest contact team would be standing in a safe area outside the residence, and then I had two others standing on the southwest corner opposite side while I got on the phone, tried to contact him, have him come out peacefully, and/or, you know, the PA of my cruiser and identify ourselves and have him come out that way" [Doc. 80, p. 13]. Accordingly, the Court finds the factual finding to be accurate.

Further, whether Sergeant Newman would have been or was successful at contacting defendant either via calling the cell phone number used to call 911 or using the PA system of his cruiser is irrelevant to the factual finding that Sergeant Newman told other officers that such was his plan of action. Accordingly, defendant's objection to this factual finding is **OVERRULED**.

### E.    Shooting at Officers

Defendant also objects to the R&R's factual finding that: "About thirty seconds after this last announcement, Defendant exited the front door of his residence, pointed a shotgun at the officers, and fired multiple rounds" [Doc. 89, p. 3 (quoting Doc. 87, p. 26)]. Defendant refutes this assertion, but acknowledges that the limited evidence presented at the hearing does not include evidence to support his position [*Id.*]. However, he states that he intends to vigorously defend this at trial [*Id.*].

14

The government responds that all of the evidence in the record supports the magistrate judge's finding in this regard, and the defendant concedes there is no evidence to the contrary [Doc. 90, p. 5].

In light of defendant's concession that there is no evidence to support his position in objecting to this factual finding, defendant's objection is **OVERRULED**.

### F.      Submission to Authority

Defendant objects to the R&R's statement that "despite the officers' Fourth Amendment violation, Defendant did not submit to their attempt to seize him.  Instead, Defendant, a known felon, fired a shotgun at the officers providing probable cause for his arrest" [Doc. 89, p. 3 (citing Doc. 87, p. 27)].  Defendant argues that submission is not at issue in this case [*Id.* at 4].

Defendant also objects to the R&R's statement that "the circumstances [] reveal that Defendant did not submit to the officers' show of authority outside his residence.  Instead, he ignored their directions, and then, when he did exit the residence, he shot at the officers. This conduct is the antithesis of submission to the officers' authority and constitutes a crime" [*Id.* at 6 (citing Doc. 87, p. 34)].  Defendant argues: "First, failure to submit to authority is not in and of itself a crime.  Submission (or failure to submit) is not an issue in the case at bar because Mr. Keller was in custody as soon as his home was surrounded by law enforcement" [*Id.*].  Defendant contends that the cases cited by the magistrate judge all involved suspects that were fleeing and Fourth Amendment violations that took place in locations where officers had a right to be [*Id.* at 7].  Here, however, officers were not in

a place where they had a lawful right to be, therefore, witnessing an alleged new crime is causally connected to the violation and retains the "taint of the violation" [*Id.*].

The government responds that "[w]hether the defendant submitted to the attempted seizure is the cored issue in this litigation" [Doc. 90, p. 5]. The government contends that the magistrate judge correctly concluded that, based on the totality of the circumstances, officers were attempting to seize defendant, but defendant did not submit to the show of authority outside his residence, and his actions of shooting at officers was the "antithesis of submission to the officers' authority" [*Id.*]. The government states that law enforcement did not seize defendant because he did not submit to the show of authority [*Id.* at 5–6].

To the extent that defendant is objecting that "failure to submit to authority is not in and of itself a crime" [Doc. 89, p. 6], the magistrate judge did not suggest that failure to submit to authority was a crime. Rather, the magistrate judge's statement at issue is that defendant "ignored [law enforcement's] directions, and then, when he did exit the residence, he shot at the officers. This conduct is the antithesis of submission to the officers' authority and constitutes a crime" [Doc. 87, p. 34]. Clearly, this statement does not indicate that the failure to submit to authority "constitutes a crime," but rather, defendant's alleged action of shooting at officers "constitutes a crime." Defendant has not suggested that the conclusion that the action of shooting at officers "constitutes a crime" is erroneous.

Further, to the extent that defendant objects that submission to authority "is not an issue in the case at bar because Mr. Keller was in custody as soon as his home was surrounded by law enforcement[,]" [Doc. 89, p. 6], this appears to be an incorrect statement

16

of the law.  The Supreme Court has held that "[a] police officer may make a seizure by a show of authority and without the use of physical force, *but there is no seizure without actual submission; otherwise, there is at most an attempted seizure*, so far as the Fourth Amendment is concerned."  *Brendlin v. California*, 551 U.S. 249, 254 (2007) (emphasis added).  Defendant appears to seek to distinguish this case, as the Fourth Amendment violation did not occur in a location "where officers had a right to be" in this case [Doc. 89, p. 7].  But defendant cites no case law in support of his contention that such a distinction exists.

Regardless, as discussed *supra*, the Court reads the R&R as concluding that officers did violate the Fourth Amendment by entering defendant's property without a warrant [*See* Doc. 87, pp. 27 (referencing "the officers' Fourth Amendment violation"), 35 (referencing officers "Fourth Amendment violation in entering [defendant's] property")].  And it is unclear how the submission issue would impact the outcome of defendant's motion to suppress.  As best the Court can determine, defendant's objection in this regard relates to his next objection, discussed *infra*, regarding the magistrate judge's conclusion that the action of shooting at officers was a new, distinct crime, committed in the officers' presence, which provided legal grounds for his eventual arrest in this case [*See id.* at 34–35].  Indeed, in this objection, defendant references his arguments in that objection, stating that "[i]n the case at bar, the officers were not in a place where they had a lawful right to be.  Therefore[,] the witnessing of an alleged new crime, [sic] is causally connected to the violation, and retains the taint of the violation, and is fruit of the poisonous tree" [Doc. 89, p. 7].

17

Accordingly, to the extent that defendant objects to the R&R's statements that he did not submit to the officers' show of authority, such objection is **OVERRULED**. To the extent that defendant's arguments go toward whether a new, distinct crime provided adequate grounds for his eventual arrest, the Court addresses that argument in Section III.G, *infra*.

### G. New, Distinct Crime

Finally, defendant objects to the R&R's conclusion that his "act of shooting at the officers was a new, distinct crime committed in the officers' presence" [Doc. 89, p. 7 (quoting Doc. 87, p. 34)]. Defendant objects that the "new distinct crime" is a product of the actions of law enforcement [*Id*.]. Because there is a causal connection between the unlawful law enforcement presence and the "new crime," the "new crime" is tainted [*Id*.]. The cases cited by the R&R involved officers in a place where they had a legal right to be, so the new crime was not tainted, but that is not the case here [*Id*. (citing *Wong Sun v. United States*, 371 U.S. 471 (1963) and *Brown v. Illinois*, 422 U.S. 590 (1975))[2]]. According to defendant, in *Wong Sun* and *Brown*, the Supreme Court held that the "taint" of the Fourth Amendment violation could only be purged when the new and distinct crime is so disconnected and independent that it is unrelated to the original violation [*Id*.]. Additionally, defendant contends that in *Utah v. Strieff*, 579 U.S. 232 (2016), the Supreme Court determined that the intervening act must be independent and unforeseeable to break

_____

[2] Defendant actually repeatedly cites to "Wong Sun and Brown v. Illinois, 422 U.S. 590, 95 S. Ct. 2254; 45 L. Ed. 2d 416 (1975)" [Doc. 89, p. 7]. The Court construes this citation as referring both to *Wong Sun v. United States*, 371 U.S. 471 (1963) and *Brown v. Illinois*, 422 U.S. 590 (1975).

the causal chain [*Id*. at 8]. Here, however, "it was foreseeable that surrounding the home of a person that the officers predetermined had 'involvement in prior incidents involving aggressive behavior and firearms [as reported] in their internal reporting system" [*Id*.]. Officers treated the situation as "high risk," determined that defendant "had a history of potentially being confrontational and could be violent," and the SWAT team had been called [*Id*.]. Given what the officers believed at the time they surrounded defendant's home, it was foreseeable that a person in that situation could respond by firing a gun [*Id*.].[3] Defendant states that there was no intervening acts that would break the causal connection between the unlawful acts of the officers and what they identified to be a new crime [*Id*.].

The government responds that the defendant "grossly misstates the law" [Doc. 90, p. 6]. Specifically, the "fruit of the poisonous tree" doctrine precludes the government from using evidence acquired during an unconstitutional search and seizure, it does not insulate the defendant from "committing new crimes that he might commit" [*Id*. at 6]. Here, police were not on defendant's property seizing evidence, and therefore, the fruit of the poisonous tree doctrine does not apply [*Id*.]. Even if the Court found that law enforcement was on defendant's property collecting evidence during an unconstitutional search and seizure, the Sixth Circuit has noted that the fruit of the poisonous tree doctrine "cannot apply in this context to prevent officers from arresting those who commit crimes during an unconstitutional search, seizure, or interrogation" [*Id*. at 6–7 (quoting *Feathers*

---

[3] In support of this argument, defendant cites "United States v. Richardson, 949 F.3d 417 (6th Cir. 2020)" [Doc. 89, p. 8]. But that citation directs to the case *Ambassador Press, Inc. v. Durst Image Tech. U.S., LLC*, 949 F.3d 417 (8th Cir. 2020). Accordingly, the Court has been unable to locate the *Richardson* case to which defendant cites.

19

Case 3:24-cr-00005-TAV-DCP    Document 100    Filed 04/17/26    Page 19 of 27
PageID #: 849

*v. Aey*, 319 F.3d 843, 852 n.2 (6th Cir. 2003))]. The government asserts that the magistrate judge correctly concluded that the defendant's act of shooting at officers was a new, distinct crime and defendant's objection should be overruled [*Id*. at 7].

"In order to make effective the fundamental constitutional guarantees of sanctity of the home and inviolability of the person, th[e] [Supreme] Court held [more than] a century ago that evidence seized during an unlawful search could not constitute proof against the victim of the search." *Wong Sun*, 371 U.S. at 484 (citing *Weeks v. United States*, 232 U.S. 383 (1914)) (internal citation omitted). Thus, "the exclusionary rule encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and . . . 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'" *Strieff*, 579 U.S. at 237 (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). But not "all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." *Wong Sun*, 371 U.S. at 487–88. "Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488 (internal quotation marks omitted).

The significant costs of the exclusionary rule have led the Supreme Court to deem it applicable only "where its deterrence benefits outweigh its substantial social costs." *Strieff*, 579 U.S. at 237 (internal quotation marks omitted). "'Suppression of evidence has always been our last resort, not our first impulse.'" *Id.* at 237–38 (quoting *Hudson v.*

20

*Michigan*, 547 U.S. 586, 691 (2006)) (internal alterations omitted). As a result, the Supreme Court has recognized several exceptions to the exclusionary rule, several of which involve the causal relationship between the unconstitutional act and the discovery of evidence. *Id.* at 238. One such exception is the attenuation doctrine, under which "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Id.* (quoting *Hudson*, 547 U.S. at 593).

"Attenuation is assessed by examining whether the evidence at issue was uncovered through law enforcement 'exploitation' of an unconstitutional seizure 'or instead by means sufficiently distinguishable' from the constitutional violation to purge it of its 'primary taint.'" *United States v. Fizer*, No. 23-1766, 2024 WL 3967195, at *2 (6th Cir. Aug. 28, 2024) (quoting *United States v. Williams*, 615 F.3d 657, 668–69 (6th Cir. 2010)). The Supreme Court has held that the three factors articulated in *Brown*, 422 U.S. 590, guide the analysis of whether there was a sufficient intervening event to break the causal chain between the constitutional violation and the discovery of evidence. *Strieff*, 579 U.S. at 239. Specifically, courts should look to: (1) the temporal proximity between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery followed the unconstitutional search; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Id.* At issue in this case is the second factor, the intervening circumstance of defendant's shooting at police.

21

With regard to that second factor, "[i]t is widely recognized that if a suspect's response to an illegal stop is itself a new, distinct crime, then the police constitutionally may arrest the suspect for that crime." *United States v. Castillo*, 238 F.3d 424 (table), 2000 WL 1800481, at *5 (6th Cir. 2000) (internal quotation marks and alterations omitted); *United States v. Gibbons*, No. 24-cr-10208, 2026 WL 622381, at *6 (D. Mass. Mar. 5, 2026) ("[U]nder the attenuation doctrine, evidence seized following a suspect's arrest for a new, intervening crime may be admitted. If a suspect responds to a stop or search—even an unlawful one—by committing a new crime, police may arrest him for that crime."). "This is true even if the new crime is in response to police misconduct and causally connected thereto." *Castillo*, 2000 WL 1800481, at *5 (internal quotation marks omitted). The Sixth Circuit has thus concluded that "the act of fleeing from police officers constitute[s] a new, distinct crime that render[s] evidence subsequently seized admissible." *United States v. Allen*, 619 F.3d 518, 526 (6th Cir. 2010) (citing *Castillo*, 2000 WL 1800481, at *6); *United States v. King*, 466 F. App'x 484, 488 (6th Cir. 2012) ("In this Circuit, fleeing or otherwise resisting an unlawful search or seizure constitutes an intervening independent act of free will that purges the taint from the initial unlawful search or seizure.").

The Sixth Circuit has subsequently explained that "*Castillo*, *Allen*, and *King* stand for the principle that when a suspect's response to an illegal stop is itself a new, distinct crime, evidence uncovered as the product of an arrest for that crime will generally be attenuated enough from the initial unconstitutional detention to mitigate the need for exclusion." *Fizer*, 2024 WL 3967195, at *3. "A contrary result could 'immunize'

22

defendants 'from prosecution for all crimes' committed following 'police misconduct.'"
*Id.* (quoting *Castillo*, 2000 WL 1800481, at *5).

First, to the extent that defendant contends that officers witnessing of the alleged new crime "retains the taint of the [constitutional] violation" because it "is causally connected to the [constitutional] violation" [Doc. 89, p. 7], such argument is directly contrary to the precedent in this Circuit that, even if a new distinct crime is causally connected to the unlawful police conduct, police may lawfully arrest a defendant for that new crime. *See Castillo*, 2000 WL 1800481, at *5. Additionally, defendant spends a significant portion of his argument disputing whether his response to the unlawful police presence on his property was reasonably foreseeable [Doc. 89, p. 8]. But, despite defendant's assertion, foreseeability is not the standard.[4] And, even if foreseeability were the standard, the Court finds it a step too far to conclude that officers should have foreseen that defendant would shoot at them upon their entry onto his property.

Defendant also seeks to distinguish the facts of his case from those cited by the magistrate judge. Defendant is correct that the cases applying this principle typically involve traffic stops. *See Castillo*, 2000 WL 1800481; *Allen*, 619 F.3d at 521; *King*, 466 F. App'x at 489; *see also Fizer*, 2024 WL 3967195, at *2 ("We have addressed the effect

---

[4] Defendant alleges that the Supreme Court stated in *Strieff*, 579 U.S. 232 that an intervening act "must be independent and unforeseeable to break the causal chain" [Doc. 89, p. 8]. But the only mention of foreseeability in *Strieff* comes from Justice Kagan's dissenting opinion. *See Strieff*, 579 U.S. at 258 (Kagan, J., dissenting). And, as noted *supra*, defendant cites one Sixth Circuit case for the proposition that an intervening event did not break the causal chain "because it was a foreseeable consequence of the unlawful stop," [Doc. 89, p. 8], but the citation defendant provides for that case is incorrect, and the Court has been unable to locate the case. Accordingly, the Court has no case law before it supporting defendant's foreseeability theory.

of a defendant's unlawful response to an unconstitutional seizure—conduct implicating the second *Brown* factor—in a series of cases involving flight from an illegal stop."). But defendant cites no case law suggesting that the commission of a new distinct crime other than fleeing a *Terry* stop would not equally provide grounds for a subsequent arrest and search. And dicta from this Circuit indicates that the new distinct crimes to which this line of precedent applies is not limited only to fleeing from law enforcement. *See King*, 466 F. App'x at 488 ("In this Circuit, fleeing *or otherwise resisting an unlawful search or seizure* constitutes an intervening independent act of free will that purges the taint from the initial unlawful search or seizure." (emphasis added)); *United States v. Gross*, 662 F.3d 393, 403 n.3 (6th Cir. 2011) ("[Defendant] did not respond to [the officer's] illegal stop with a new and distinct crime, such as flight *or violence*, that would serve to purge the taint of the unlawful detention" (emphasis added)).

Perhaps more importantly, defendant argues that the facts of this case are distinguishable because, in these prior cases, officers were in locations where they "had a right to be," whereas here, "the officers [were] trespassing on a property" [Doc. 89, p. 7]. But, again, defendant cites no cases recognizing such a distinction exists, nor does defendant explain why that fact particularly matters. All of the cases at issue, including this case, involve the violation of a constitutional right by police, and a subsequent criminal act by a defendant that purged the taint from that constitutional violation, rendering the subsequently discovered evidence admissible. It is unclear how the rationale that supports a conclusion that committing the offense of fleeing from officers in response to an unlawful stop is a new distinct crime that removes the "primary taint," would not equally apply when

24

a defendant commits the offense of shooting at officers in response to an attempted illegal seizure at his home. Defendant appears to suggest that the "taint" is connected to the location at issue [*See* Doc. 89, p. 7 ("In the cases cited by the Magistrate Court, the officers were in a place where they had a legal right to be, so the new crime was not tainted. Such is not the case here.")]. But the "taint" does not stem from the officers' location. The "taint" stems from the constitutional violation. And defendant does not explain how the "taint" from the constitutional violation is distinguishable based on the location of the violation.

Turning to the *Brown* factors, then, the Court first finds that the temporal proximity between the constitutional violation and the discovery of evidence supports suppression. The Supreme Court has "declined to find that this factor favors attenuation unless 'substantial time' elapses between an unlawful act and when the evidence is obtained." *Strieff*, 579 U.S. at 239. And, here, it does not appear that a significant period of time elapsed between the officers' unconstitutional entry into defendant's property and defendant's ultimate arrest.

As to the third factor, "the purposefulness factor is met when the unlawful action is investigatory, that is, when officers unlawfully seize a defendant in the hope that something might turn up." *United States v. Arrington*, 440 F. Supp. 3d 719 (E.D. Mich. 2020) (internal alteration and quotation marks omitted). And "[a]n officer's conduct is flagrant if it violates well-established legal rules." *Id.* The Court finds this factor neutral in this case. Although the Court has determined that the officers violated defendant's Fourth Amendment rights by entering the curtilage of his home without a warrant, the Court does

25

not find that such conduct was "flagrant." Instead, it appears that this conduct was, at most, negligent, and the Supreme Court has suggested that merely negligent conduct does not support suppression in this circumstance. *See Strieff*, 579 U.S. at 241–42. "Moreover, there is no indication that this [violation] was part of any systemic or recurrent police misconduct," but rather, it appears to have been an "isolated instance of negligence[.]" *Id.* at 242.

For all the reasons explained above, the second factor weighs strongly in favor of attenuation. Defendant's conduct of shooting at officers in response to their presence on his property is a new, distinct crime, which courts have regularly found suffice as an intervening circumstance warranting attenuation. And, indeed, the alleged conduct here, shooting at police officers, is more extreme behavior than this Circuit's precedents have previously addressed.

Furthermore, significant policy reasons support a conclusion that defendant's ultimate arrest for the new, distinct crime of shooting at officers was permissible, and any attendant evidence admissible. "[W]here the defendant's response is itself a new, distinct crime, there are strong policy reasons for permitting the police to arrest him for that crime." *United States v. Bailey*, 691 F.2d 1009, 1017 (11th Cir. 1982). As the Eleventh Circuit aptly stated:

> Unlike the situation where in response to the unlawful police action the defendant merely reveals a crime that already has been or is being committed, extending the fruits doctrine to immunize a defendant from arrest for new crimes gives a defendant an intolerable carte blanche to commit further criminal acts so long as they are sufficiently connected to the chain of causation started by the police misconduct. This result is too far reaching and too high a price for society to pay in order to deter police misconduct.

*Id.* The Court agrees and finds that this rationale particularly true here. Allowing defendant a carte blanche to open fire on police officers in response to their presence on his property without a warrant is too high a price for society to pay to deter police misconduct.

For all these reasons, the Court finds that defendant's alleged conduct of shooting at officers on his property was a new, distinct crime, and therefore, his arrest after that conduct was lawful and any evidence obtained in connection with that arrest is admissible. Defendant's objections on this ground are **OVERRULED**.

## IV. Conclusion

For the reasons above, the Court **ACCEPTS** and **ADOPTS** the R&R [Doc. 87] in whole and **DENIES** the motion to suppress evidence [Docs. 62, 64]. Defendant's objections to the R&R [Doc. 89] are **OVERRULED**.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE
